IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 1, 2022

**IN RE ALESSA H.**

**Appeal from the Chancery Court for Lawrence County**
**No. 21-19711  Stella L. Hargrove, Chancellor**

_____

**No. M2021-01403-COA-R3-PT**

_____

Following the entry of a default judgment against a mother who failed to answer the petition to terminate her parental rights, the trial court terminated the mother's parental rights to her child on the grounds of (1) abandonment by failure to establish a suitable home; (2) substantial noncompliance with the permanency plan; (3) persistence of conditions; and (4) failure to manifest an ability and willingness to personally assume custody or financial responsibility. The trial court further found that termination of the mother's parental rights was in the child's best interest. The mother moved to set aside the default judgment. We affirm the trial court's denial of the motion to set aside the default judgment. We affirm the trial court's conclusion that clear and convincing evidence supports the aforementioned grounds for termination. However, we remand for the trial court to determine whether the termination of the mother's parental rights is in the best interest of the child pursuant to the new statutory factors which became effective on the date the petition was filed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed in Part, Affirmed in Part; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S, and CARMA DENNIS MCGEE, J., joined.

M. Wallace Coleman, Jr., Lawrenceburg, Tennessee, for the appellant, Stephanie H.[1]

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names to protect their identities.

Herbert H. Slatery, III, Attorney General & Reporter, Andrée Blumstein, Solicitor General, and Amber L. Barker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Stacie L. Odeneal, Lawrenceburg, Tennessee, Guardian *ad litem*.

**OPINION**

## I.    BACKGROUND

Alessa H. ("the child") was born in 2020 to Stephanie H. ("Mother"). There is no putative or legal father of the child. Mother also has an older child who is not in her custody.

The proceedings underlying this appeal began when Mother's cousin filed a petition in the Juvenile Court for Lawrence County alleging that Mother was homeless and requesting temporary custody of the child until Mother found a stable home. The child was temporarily placed in Mother's cousin's custody. A guardian *ad litem* was appointed to advocate for the child. Following a court-ordered investigation, the child was ordered into the custody of the Tennessee Department of Children's Services ("DCS") on July 6, 2020. The child has remained in DCS's custody since that date. By petition filed July 30, 2020, DCS alleged, among other things, that: the child was dependent and neglected; Mother was homeless and left the child "for a significant period of time" with her cousin; Mother lacked the means to care for the child; Mother was "substantiated in 2017 for drug exposed child and environmental neglect of an older child;" Mother's cousin "has an extensive DCS history;" and that the child had a deformational flat spot on the side of her head. Mother's cousin subsequently dismissed her petition. By order entered March 11, 2021, the juvenile court adjudicated the child dependent and neglected. Mother was represented by counsel who also represents her in this appeal. Mother stipulated to the juvenile court that she still lacked stable housing and the proper means to provide for the child, and that she left the child with relatives who lacked the legal means to care for the child.

In July 2020, Mother and DCS created a permanency plan which was ratified by the court. Under the plan, Mother's responsibilities were to: participate in and timely arrive to therapeutic visits with the child and provide needed items; participate in parenting education; complete an alcohol and drug assessment and follow any recommendations; identify positive supports in the community; pass random drug screens; maintain a means of communication in case of emergency; engage with positive peers instead of individuals involved in substance abuse, domestic violence, or legal

issues; take medications only as prescribed and submit to random pill counts; complete a mental health intake and follow recommendations; maintain and prove a legal source of income; attend the child's medical appointments; obtain, maintain, and prove safe and stable housing; work toward earning a driver's license or provide a transportation plan; pay child support; notify DCS of changes in employment, contact information, or residence; participate in homemaker services, including budgeting; and share information about any individuals residing in the home so that their backgrounds could be checked. The permanency plan was twice amended and ratified, but the responsibilities remained the same. Each plan repeated the permanency goals of return to parent and adoption.

On April 22, 2021, the guardian *ad litem* petitioned the Chancery Court for Lawrence County ("trial court") to terminate Mother's parental to the child, alleging several statutory grounds.[2] Mother was served the petition by personal service effectuated the following day, April 23. Because Mother failed to answer, appear, or otherwise oppose the petition, the guardian *ad litem* moved for a default judgment on June 4, 2021. Through Certified Mail, this motion was mailed to Mother at her address of service and she received it on June 9, 2021. Pursuant to Tennessee Rule of Civil Procedure 20.01, DCS moved to join the petition for termination of parental rights on June 14, 2021.

On June 16, 2021, the parties appeared for an annual permanency hearing.[3] Mother was represented by counsel. The juvenile court found that Mother was not in substantial compliance with the then-current permanency plan because she did not have safe or stable housing, she continued to fail drug screens for unprescribed medication, and had only recently complied with mental health services.

On June 23, 2021, the trial court held a hearing on the termination petition and all pending motions. Fourteen minutes before trial, Mother, appearing pro se, filed an answer to the termination petition. The Clerk and Master's Office notified the other parties of Mother's filing. The trial court granted DCS's motion to join the action. Following its questioning of Mother and an unfavorable credibility finding, the trial court granted the motion for default judgment. The trial proceeded on the termination petition.[4]

---

[2] Upon proper motion, the trial court struck the termination ground of severe child abuse, Tennessee Code Annotated section 36-1-113(g)(4).

[3] *See* Tenn. Code Ann. § 37-2-409.

[4] "The court may enter a default judgment against any party to the . . . termination proceeding upon a finding that service of process has been validly made against that party in accordance with the Tennessee Rules of Civil or Juvenile Procedure and the statutes concerning substituted service; however, in termination proceedings, proof must be presented as to legal grounds and best interest pursuant to § 36-1-113." Tenn. Code Ann. § 36-1-117(n).

DCS family service worker, Bianca Cathey, and foster parent, Andrea M., testified.[5]  The child was then seventeen months old.

By order entered August 30, 2021, the trial court found clear and convincing evidence of the following grounds for termination of Mother's parental rights and those of any putative fathers: (1) abandonment by failure to establish a suitable home; (2) substantial noncompliance with the permanency plan; (3) persistence of conditions; and (4) failure to manifest an ability and willingness to personally assume custody or financial responsibility.  The trial court also determined that termination of Mother's parental rights was in the child's best interest.

On September 22, 2021, Mother pro se moved the trial court to reconsider and/or set aside the default judgment asserting, "this isn't fair because I didn't get to participate and give my side of the story."  She also requested and was appointed counsel.  The guardian *ad litem* responded to the motion and the trial court heard it on October 1, 2021.  The trial court found that Mother was properly served with the termination petition and the motion for default.  The trial court further credited Mother's testimony that she did not read the pleadings underlying the termination proceedings because they were too upsetting to her.  Finding that Mother failed to establish a legal basis to set aside the default judgment pursuant to Tennessee Rule of Civil Procedure 60.02, the trial court denied Mother's motion by order entered October 28, 2021.  Mother appealed from that order.

## II.    ISSUES

Mother raises two issues on appeal:

A. Whether the trial court erred in granting a default judgment against her.

B. Whether the trial court erred in denying Mother's motion to set aside the default judgment.

Mother challenges neither the trial court's findings on the four statutory grounds supporting termination of her parental rights nor the trial court's finding that termination was in the child's best interest.  Nevertheless, we shall review them.  *See In re Carrington H.*, 483 S.W.3d 507, 525–26 (Tenn. 2016) (holding that "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's

---

[5] The testimony will be discussed in greater detail below as relevant to the issues on appeal.

- 4 -

findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

Accordingly, we consolidate the additional issues on appeal as follows:

C. Whether clear and convincing evidence supports the trial court's findings of the statutory grounds for termination.

D. Whether clear and convincing evidence supports the trial court's findings that termination of Mother's parental rights was in the best interest of the child.


### III. STANDARD OF REVIEW

"In reviewing a trial court's decision to grant or deny relief pursuant to Rule 60.02, we give great deference to the trial court." *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003). "A Rule 60.02 motion for relief from a judgment is within the sound discretion of the trial court and the court's ruling on a Rule 60.02 motion may not be reversed on appeal unless it is determined that the court abused its discretion." *Holiday v. Shoney's South, Inc.*, 42 S.W.3d 90, 92 (Tenn. Ct. App. 2000) (citations omitted); *see also Turner v. Turner*, 473 S.W.3d 257, 268 (Tenn. 2015). An abuse of discretion occurs only when the trial court has "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *Henry*, 104 S.W.3d at 479 (citations omitted). "The abuse of discretion standard does not permit an appellate court to merely substitute its judgment for that of the trial court." *Id*.

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See In Re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*,

77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon:

(1)     [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights.

The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d at 523–24 (citations omitted); *see also In re Gabriella D.*, 531 S.W. 3d 662, 680 (Tenn. 2017).

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). "Thus, this court gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## IV.    DISCUSSION[6]

### A.

On appeal, Mother argues that the trial court erred in granting the guardian *ad litem*'s motion for default judgment in the first instance. "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, judgment by default may be entered" in accordance with Tennessee Rule of Civil Procedure 55.01. Tenn. R. Civ. P. 55.01. A party "against whom a default judgment is sought shall be served with a written notice of the application at least five days before the hearing on the application." *Id*. The parties do not dispute that Mother was personally served with the petition to terminate her parental rights on April 23, 2021, the day after it was filed in the trial court. Accordingly, Mother had thirty days, until May 24, 2021,[7] to

---

[6] We will reference the statutes which were in effect when the guardian *ad litem* filed the petition for termination of parental rights on April 22, 2021.

[7] Because the thirty-day period expired on a Sunday (May 23, 2021), Mother's deadline to file an answer was on the following day. *See* Tenn. R. Civ. P. 6.01.

answer the petition. She failed to do so by that date. As a result, the guardian *ad litem* moved for a default judgment on June 4, 2021. The parties do not dispute that Mother was timely served with the notice of the motion for default judgment set to be heard on June 23, 2021. Mother filed an answer moments before the hearing.

Mother appeared for the June 23 hearing during which the trial court elicited her testimony as to the circumstances of her delayed response. At first, Mother testified that she delayed filing an answer to the petition because she "wasn't sure how to do it." Mother explained that she did not complete the tenth grade and that she "can comprehend certain things but [has] comprehension problems as it is." Mother affirmed that she understood the directive on the face of the civil summons to defend the termination petition within thirty days of service. Mother also testified that her appointed attorney in the underlying dependency and neglect proceedings advised that she could file an answer any time before trial. Then, Mother testified that counsel instructed her to bring him the termination petition because he was unfamiliar with such documents. The trial court found Mother's testimony was not credible because the trial court was familiar with that attorney and knew him to be experienced with and knowledgeable about parental termination proceedings. The trial court ruled that trial would proceed by default against Mother. During opening statements, the trial court revisited its ruling and offered Mother another opportunity to clarify her testimony. The court reminded Mother that she was under oath and confirmed that she understood the concept of perjury. Mother stated that she spoke with counsel about the petition to terminate parental rights the same week she was served, but doubled down on her testimony about the purported advice she received regarding the timeline in which to file an answer.

The trial court found that Mother's testimony was incredible in its entirety, that she failed to timely respond to the petition as required by law, and that Mother was "disingenuous in her efforts to delay" the proceedings. Upon review, and keeping in mind the great weight that the trial court's credibility findings are afforded on appeal,[8] we discern no reversible error in the trial court's decision to grant the motion for default judgment pursuant to Rule 55.01.

---

[8] *See, e.g., Weatherford v. Weatherford*, No. W1999-01014-COA-R3-CV, 2000 WL 1891057, at *4 (Tenn. Ct. App. Dec. 29, 2000) ("The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court.").

B.

Mother contends that the trial court erred in denying her motion to set aside the default judgment pursuant to Tennessee Rule of Civil Procedure 60.02. "For good cause shown the court may set aside a judgment by default in accordance with Rule 60.02." Tenn. R. Civ. P. 55.02. Rule 60.02 specifies the grounds upon which a party may be granted relief as follows:

> On motion and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (3) the judgment is void; (4) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that a judgment should have prospective application; or (5) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1) and (2) not more than one year after the judgment, order or proceeding was entered or taken.

Tenn. R. Civ. P. 60.02. Although courts construe Rule 60.02 "with liberality to afford relief from a default judgment," the movant bears the burden of showing "why the movant was justified in failing to avoid the mistake, inadvertence, surprise or neglect." *Tenn. Dep't of Human Servs. v. Barbee*, 689 S.W.2d 863, 866–67 (Tenn. 1985) (quoting *Tenn. State Bank v. Lay*, 609 S.W.2d 525, 527 (Tenn. Ct. App. 1980)).

In determining whether a default judgment should be vacated, Tennessee courts also must consider, in addition to the justifications provided under Rule 60.02, the following three criteria: 1) whether the default was willful; 2) whether the defendant has asserted a meritorious defense; and 3) the amount of prejudice which may result to the non-defaulting party. *Reynolds v. Battles*, 108 S.W.3d 249, 251 (Tenn. Ct. App. 2003) (citing *Barbee*, 689 S.W.2d at 866). "The first element—willfulness—is a threshold inquiry when a party seeks relief from a default judgment based on excusable neglect." *In re Justin A.H.*, No. M2013-00292-COA-R3-CV, 2014 WL 3058439, at *14 (Tenn. Ct. App. June 7, 2014) (citing *Discover Bank v. Morgan*, 363 S.W.3d 479, 493–94 (Tenn. 2012)). "If the court finds that the defaulting party has acted willfully, the judgment cannot be set aside on 'excusable neglect' grounds, and the court need not consider the other factors." *Discover Bank*, 363 S.W.3d at 494. Making "deliberate choices" amounts to willful conduct. *Id*. at 493.

In her motion, Mother requested the trial court to set aside the default judgment because, in her view, it was unfair that she "didn't get to participate and give [her] side of the story" during the termination proceeding. On appeal, Mother argues excusable neglect based on the fact that she has a ninth-grade education and "did what she knew to do." During the hearing on Mother's Rule 60.02 motion, Mother testified that she stopped reading the petition to terminate parental rights because the allegations about substance abuse were upsetting to her. The trial court noted that the first mention of Mother's drug use was on page four of the petition. Mother explained that she delayed filing an answer because she needed help understanding the petition and because counsel in the underlying dependency and neglect proceeding had advised that she could file the answer on the day of trial, an assertion previously found incredible by the trial court. Mother admitted to understanding that she could have requested court-appointed counsel to represent her in the termination proceedings because she had such in two other proceedings. She thought she would be able to defend herself.

In its order denying the Rule 60.02 motion, the trial court credited Mother's assertions, but did not find credible her reasons to excuse the significant delay in filing an answer. We affirm this finding. Moreover, the record demonstrates that Mother's conduct was willful. By her testimony, she deliberately failed to read the petition to terminate parental rights in its entirety. With purpose, she consulted prior counsel regarding the pleadings and then deliberately ignored the pleadings until the morning of trial, offering no logical explanation for this course of action. Mother also deliberately chose to represent herself in the termination proceedings. Because the record demonstrates that Mother's conduct was willful, we need not examine the other factors to determine whether she has established excusable neglect. *Discover Bank*, 363 S.W.3d at 494. Consequently, under these circumstances, we conclude that the trial court did not abuse its discretion in denying Mother's motion to set aside the default judgment. We affirm the trial court's decision and its finding that Mother did not establish a legal basis to set aside the judgment by default.

## C.

As stated above, the trial court granted the termination petition against Mother based upon the following statutory grounds: (1) abandonment by failure to establish a suitable home; (2) substantial noncompliance with the permanency plan; (3) persistence of conditions; and (4) failure to manifest an ability and willingness to personally assume custody or financial responsibility. We will discuss each ground in turn.

A parent may be found to have abandoned his or her child by failing to establish a suitable home. Tenn. Code Ann. § 36-1-113(g)(1). This ground for the termination of parental rights is established when:

> (a)     The child has been removed from the home or the physical or legal custody of a parent or parents . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

> (b)     The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

> (c)     For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents . . . to establish a suitable home for the child, but that the parent or parents . . . have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent . . . toward the same goal, when the parent . . . is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii). This ground for termination requires DCS to make reasonable efforts to assist a parent in obtaining a suitable home. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c); *In re Kaliyah S.*, 455 S.W.3d 533, 555 n.32 (Tenn. 2015). Although the statute requires DCS to make reasonable efforts toward the establishment of a suitable home for "a period of four (4) months following the physical removal" of the children, "the statute does not limit the court's inquiry to a period of four months immediately following the removal." *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016). A suitable home requires "'more than a proper physical living location.'" *In re Daniel B.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *4 (Tenn. Ct. App. July 10, 2020) (quoting *Tenn. Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3

(Tenn. Ct. App. Nov. 29, 2007)). It requires a "safe and stable environment in which a child can live and 'the presence of a care giver who can supply the care and attention a child needs.'" *In re James V.*, No. M2016-01575-COA-R3-PT, 2017 WL 2365010, at *5 (Tenn. Ct. App. May 31, 2017) (quoting *In re Malaki E.*, No. M2014-01182-COA-R3-PT, 2015 WL 1384652, at *9 (Tenn. Ct. App. Mar. 23, 2015)) (citation omitted).

Here, the child was ordered by the juvenile court into DCS's custody on July 6, 2020. The juvenile court found that DCS made reasonable efforts to prevent removal. DCS subsequently filed a petition alleging that the child was dependent and neglected. The record shows that DCS made reasonable efforts to assist Mother in establishing a suitable home for the child. These included developing permanency plans, attempting to arrange homemaker services, and offering parenting instruction. Ms. Cathey testified that Mother had been living with a housemate, Mr. R., since July 2020. DCS determined that Mr. R. had a negative history with DCS. He also had a history of physical abuse and domestic violence, including a recent conviction for domestic assault. For those reasons, Mother was instructed that Mr. R. was an inappropriate roommate. Nevertheless, Mother continued to live with Mr. R. and related to Ms. Cathey that she did not understand why the child could not return to live in such a situation. The week before trial, Mother requested that Mr. R. be added to the permanency plan. At trial, it was established that Mr. R.'s brother and a dog with violent tendencies were also living in the home and that Mother was financially supporting all of them. Ms. Cathey walked through the home during the week preceding trial and reported that the living room and bathroom were clean, but that there were roaches and unsafe flooring elsewhere. At trial, it was also established that lack of housing was not a new issue for Mother because her oldest child was removed from her custody in 2017 due to housing instability, environmental neglect, and drug exposure. By the time of trial, Mother still lacked legal or physical custody of her oldest child.

In this case, DCS's efforts to assist Mother exceeded her own efforts to establish a suitable home. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c) ("The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]"). Ms. Cathey advised Mother that once she provided DCS with legal proof of the residence (*e.g.*, a lease or rent receipts), DCS could provide Mother with homemaker services and help her prepare an itemized budget to ensure she could financially maintain the home in the future. Mother did not provide proof of housing, so she could not receive these services.

Under the circumstances of this case, we, like the trial court, conclude that Mother abandoned the child by failing to establish a suitable home for her. This ground was

proven by clear and convincing evidence and we affirm the trial court's judgment terminating Mother's parental rights on this ground.

*Substantial Noncompliance with the Permanency Plan*

A court may terminate a parent's parental rights when the parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). To terminate parental rights under this ground, the court "must first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *10 (Tenn. Ct. App. June 10, 2014). "Conditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547. "The trial court must then find that the noncompliance is substantial." *In re Hannah H.*, 2014 WL 2587397, at *10 (citation omitted). When determining whether a parent's noncompliance with a plan was substantial, the court must do more than "count[] up the tasks in the plan to determine whether a certain number have been completed." *In re Carrington H.*, 483 S.W.3d at 537. DCS must show "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d at 548–59; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003)).

In the period that followed the child's removal, DCS created three permanency plans, all of which were ratified by the juvenile court. The permanency plans required Mother to: participate in and timely arrive to therapeutic visits with the child and provide needed items; participate in parenting education; complete an alcohol and drug assessment and follow any recommendations; identify positive supports in the community; pass random drug screens; maintain a means of communication in case of emergency; engage with positive peers instead of individuals involved in substance abuse, domestic violence, or legal issues; take medications only as prescribed and submit to random pill counts; complete a mental health intake and follow recommendations; maintain and prove a legal source of income; attend the child's medical appointments; obtain, maintain, and prove safe and stable housing; work toward earning a driver's license or provide a transportation plan; pay child support; notify DCS of changes in employment, contact information, or residence; participate in homemaker services, including budgeting; and share information about any individuals residing in the home so that their backgrounds could be checked.

Here, the trial court reaffirmed the juvenile court's finding that Mother's responsibilities under the parenting plans were reasonable and related to the conditions

necessitating foster care. For most of the custodial episode, Mother demonstrated little to no effort to address the permanency plans' requirements. Ms. Cathey testified that although Mother consistently participated in therapeutic visitation and paid child support, she did not consistently comply with the other important requirements. As discussed above, Mother never remedied her housing situation to where it could be safe for the child. Ms. Cathey noted that Mother never shared proof of housing or of utilities, which prevented DCS from providing homemaker services. Further, Ms. Cathey recounted that although Mother participated in mental health treatment, she missed appointments, did not receive services for a couple of months, and waited until near the time the termination petition was filed before consistently attending. Mother completed an alcohol and drug assessment and intensive outpatient treatment, but unfortunately failed a drug screen for amphetamines afterward in April 2021. She never provided DCS with documentation of her sponsor or of a means of communication in case of an emergency, so Ms. Cathey understandably questioned whether Mother appreciated the importance of sobriety as it relates to the ability to safely and appropriately parent a young child. In Ms. Cathey's view, Mother "participated in parenting education, although there was trouble scheduling and [she] would fall asleep due to being tired from work during the sessions." Mother did not try to earn a driver's license and conjectured that Mr. R.'s brother could ensure that the child was taken to medical appointments. She did not otherwise have a transportation plan. Mother attended only three of the child's medical appointments at Vanderbilt[9] and none of the local appointments including those related to feeding therapy. Ms. Cathey explained that, as a result, Mother missed valuable learning opportunities. She also expressed concern about reuniting the child with a mother who lacked knowledge about her child's medical history or required care.

We "determine compliance in light of the permanency plan's important goals." *In re Bonnie L.*, 2015 WL 3661868, at *8. This Court has previously explained:

> As we see it, the compliance required with a permanency plan is that which is necessary to overcome the reasons that children are removed from a parent and placed in foster care. Regaining custody requires parents to complete certain tasks and maintain compliance with the plan to the point that it is appropriate and safe to return the children to them. In our view, a permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored. Rather, it is an outline for doing the things that are necessary to achieve the goal of permanency in children's lives. We think that where "return to parent" is the goal, parents must complete their responsibilities in a manner that demonstrates that they

---

[9] These appointments were related to the child's skull development and treating the flat spot on her head.

- 14 -

are willing and able to resume caring for their children in the long-term, not on a month-to-month basis.

*In re V.L.J.*, No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at \*8 (Tenn. Ct. App. Dec. 30, 2014). The evidence does not preponderate against the trial court's finding that "[Mother's] moments of compliance coincide in time with moments of increasing risk to her role as parent" or its finding that Mother's noncompliance was substantial. We affirm the trial court's determination that the evidence clearly and convincingly established that Mother was in substantial noncompliance with the permanency plans. Accordingly, we affirm the trial court's judgment terminating Mother's parental rights based upon this ground.

*Persistence of Conditions*

"Persistence of conditions" may be established as a ground for termination of parental rights when:

(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3).

Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550. Additionally, the persistence of conditions ground may only be applied "where the prior court order removing the child from the parent's home was based on a judicial finding of dependency, neglect, or abuse." *In re Audrey S.*, 182 S.W.3d at 874. The statute does not require that only the original conditions leading to removal be used to establish grounds for termination. On the contrary, the statute specifically includes both "[t]he conditions that led to the child's removal . . . or other conditions [ ] that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect[.]" Tenn. Code Ann. § 36-1-113(g)(3)(A)(i). "A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re Navada N.*, 498 S.W.3d at 605 (omission in original) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)). When DCS's efforts to help "improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *In re T.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000). The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Dakota C.R.*, 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012) (citing *In re A.R.*, 2008 WL 4613576, at *20).

Here, the child was removed from Mother by court order and then adjudicated dependent and neglected more than six months before the termination hearing. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)–(B). The conditions leading to the child's removal included Mother's lack of stable housing and means to provide for her and Mother's leaving the child with a relative who also lacked the means to provide for her. In the eleven months following the child's removal, Mother did not remedy these conditions. She continued to live with inappropriate male roommates, one of whom had a history of domestic violence. About two months before trial, Mother failed a drug screen for amphetamines. "It is generally without dispute that a home where drugs are being abused is not safe for a child." *In re Daylan D.*, No. M2020-01647-COA-R3-PT, 2021 WL 5183087, at *10 (Tenn. Ct. App. Nov. 9, 2021). Additionally, the evidence adduced at trial revealed that Mother recently lost her job due to poor attendance and failed to report this to DCS as required. This fact reasonably called into question her ability to provide for the child's needs at an early date.

Following removal, the child underwent extensive medical treatment to correct a flat spot on her head. Mother missed most of the appointments as well as the child's necessary feeding therapy. By contrast, while in foster care, the child was cared for by someone who was in tune with her needs, so she completed both the medical treatment and the feeding therapy. Ms. Cathey testified that when the child was dropped off for visits with Mother, she screamed for the foster parent, a person with whom she has developed a significant attachment. With the foregoing considerations in mind, and also considering the length of time the child has been in DCS's custody, we affirm the trial court's finding that "[t]he continuation of the legal parent-child relationship between the child and [Mother] as it currently exists greatly diminishes the child's ability to be integrated into a permanent legal parent/child relationship." *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii).

We have determined that there is clear and convincing evidence sufficient to prove the ground of persistence of conditions, Tennessee Code Annotated section 36-1-113(g)(3). Accordingly, we affirm the trial court's judgment terminating Mother's parental rights based upon this ground.

*Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility*

Pursuant to Tennessee Code Annotated section 36-1-113(g)(14) parental rights may be terminated when:

> A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires the petitioner to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14); *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). First, a petitioner must prove that the parent failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *In re Neveah M.*, 614 S.W.3d at 674. Second, a petitioner must prove that placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *Id.*

As to the first element, our Supreme Court has instructed as follows:

[S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied.

*Id*. at 677 (citation omitted).

As to the second element, whether placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child," we have explained:

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray*, 83 S.W.3d at 732 (footnotes omitted)).

The record before us reveals that, from the child's infancy, Mother failed to manifest an ability to care for her. "Ability focuses on the parent's lifestyle and circumstances." *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019) (citing *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018)). As discussed in our review of the testimony above, Mother's lifestyle and circumstances included: sharing a home with a dog with violent tendencies and with two unemployed men, one of whom was convicted of domestic assault; her own unemployment at the time of trial; a failure to maintain sobriety; and a lack of transportation.

The trial court questioned Mother's willingness to assume legal and physical custody or financial responsibility of the child finding:

Not only has [Mother] failed to overcome the obstacles that prevent her from assuming custody or financial responsibility for the child, but she has largely ignored there are obstacles that exist as she has demonstrated by her

- 18 -

refusal to obtain proper housing, consistently participate in services, or even respond to the underlying petition in this matter.

The evidence in the record does not preponderate against this finding.

We also agree with the trial court's assessment of the evidence regarding the element of substantial harm:

[T]estimony has established the continued need for the child to be in the care and custody of safe, appropriate, and attentive caregivers who are able to articulate and implement measures to meet the child's needs. It is clear [Mother] is not that caregiver. Furthermore, the Court finds [Mother] is not willing to be considered as such, and any hope of [the] same lies with placement through foster care. The Court finds [DCS] has carried the burden relative to the second prong and placing the child in the custody of [Mother] who has not meaningfully participated in services nor has any hint of stability about her would pose a certain risk of immediate and irreparable harm to the child.

By the time of trial, the child had been in the foster parent's care since her infancy and was bonded to the foster parent. The child was progressing with her medical treatment. With the foregoing considerations in mind, we believe that the child's placement in Mother's custody would pose a risk of substantial harm to her welfare. We conclude that DCS proved by clear and convincing evidence that Mother failed to manifest both an ability and willingness to assume custody or financial responsibility of the child and that placing her in Mother's care would pose a risk of substantial harm to the physical or psychological welfare of the child.

### D.
### *Best Interest of the Child*

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, the trial court was required to consider whether termination of Mother's parental rights was in the best interest of the child. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860.

Effective April 22, 2021, the General Assembly amended Tennessee Code Annotated § 36-1-113(i) by deleting the previous subsection in its entirety and substituting a new subsection providing, inter alia, twenty factors to be considered in determining a child's best interest in a case involving termination of parental rights. *See* 2021 Tenn. Pub. Acts, Ch. 190 § 1 (S.B. 205). Thus, "the amended statute applies only

- 19 -

to petitions for termination filed on or after April 22, 2021." *In re Riley S.*, No. M2020-01602-COA-R3-PT, 2022 WL 128482, at *14 n.10 (Tenn. Ct. App. Jan. 14, 2022) perm. app. denied (Tenn. Mar. 17, 2022). The statute, as amended, provides:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

Tenn. Code Ann. § 36-1-113(i).

Here, the guardian *ad litem* filed the petition to terminate parental rights on the exact date that the amended statute went into effect. Therefore, the amended statute applies to this action. In making the best interest determination, the trial court applied the previous best interest factors. On appeal, the guardian *ad litem* politely acknowledges that she mistakenly argued the previous factors at trial. This Court has observed that the nine old factors "are included in the new version of factors that went into effect in April 2021." *In re Da'Moni J.*, No. E2021-00477-COA-R3-PT, 2022 WL 214712, at *23 (Tenn. Ct. App. Jan. 25, 2022) perm. app. denied (Tenn. Apr. 1, 2022). However, the statute as amended adds a number of "additional factors that should be considered, if relevant." *In re Riley S.*, 2022 WL 128482, at *14 n.10; *see also* Dawn Coppock, *Happier Childhoods and Better Best Interest Factors*, 57 Tenn. B.J. 24, 26 (July/Aug. 2021) (stating that courts are not "required to make findings for each enumerated factor, but are directed to identify the factors relevant to the case at bar, including any other 'child-centered factors' and to make specific findings of fact regarding only the factors considered"). Accordingly, we reverse the trial court's finding that termination of Mother's parental rights is in the child's best interest and remand this case to the trial court for findings on the applicable, expanded new best interest factors. The trial court's findings on the applicable factors will provide an adequate and proper record for our review of the court's best interest determination. We recognize that time has marched on during this litigation, so the trial court may, in its discretion, consider additional evidence on remand. In light of our holding in section B. above, the proceedings shall continue by default against Mother.

## V.     CONCLUSION

The judgment of the trial court is affirmed in part and reversed in part.  The case is remanded for findings on the applicable best interest factors and such further proceedings as may be necessary and consistent with this Opinion.  Costs of the appeal are taxed to the appellant, Stephanie H.

_____
JOHN W. McCLARTY, JUDGE